In re Joseph L. HART, Debtor.

Joseph L. Hart, Plaintiff,

v.

GMAC Mortgage Corporation And Federal National Mortgage Association, Defendants.

Bankruptcy No. 98–18529–JNF.
Adversary No. 98–2170.

United States Bankruptcy Court,
D. Massachusetts.

March 27, 2000.

Harvey S. Shapiro, Collier, Shapiro & McCutcheon, Cambridge, MA, for Plaintiff, Joseph L. Hart.

Daniel P. Murphy, Harmon Law Offices, for Defendants GMAC Mortgage & FNMA.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matters before the Court are the Second Amended Adversary Complaint

filed by Joseph L. Hart (the "Debtor") against GMAC Mortgage Corporation ("GMAC") and Federal National Mortgage Association ("Fannie Mae") (collectively, the "Defendants") and GMAC's objection to confirmation of the Debtor's First Amended Chapter 13 Plan.[1] The issue presented is whether GMAC and Fannie Mae are liable to the Debtor for damages because of improper attempts to collect the Debtor's mortgage debt.

The Debtor's Second Amended Adversary Complaint, which was filed on July 1, 1998, contains seven counts as follows: Count I—Breach of Contract; Count II—Violation of Mass. Gen. Laws Ann. Ch. 163, § 60 (West 1991 & Supp.1999); Count III—Violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692–1692o (West 1998)("FDCPA"); Count IV—Violation of Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws Ann. Ch. 140D, §§ 1–34 (West 1991 & Supp.1999) ("MCCCDA"); Count V—Violation of the Truth in Lending Act, 15 U.S.C. §§ 1601–1667e (West 1998) ("TILA"); Count VI—Violation of the Automatic Stay; and Count VII—Violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws Ann. Ch. 93A, §§ 1–11 (West 1997) ("Chapter 93A"). GMAC and Fannie Mae answered the Second Amended Complaint. In accordance with the Court's pre-trial order, the parties filed a 31-page Joint Pre–Trial Memorandum on November 8, 1999.

The Court conducted a two-day trial on December 7, 1999 and January 5, 2000 at which four witnesses testified and 55 exhibits were accepted into evidence.[2] At the conclusion of the Debtor's case, the Defendants moved for a directed verdict. The Court now denies the Defendants' Motion for a Directed Verdict and makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## II. FACTS

### A. *The Debtor's Chapter 13 Case*

The Debtor filed a voluntary Chapter 13 petition on September 1, 1998. On September 16, 1998, he filed Schedules, a Statement of Financial Affairs and a Chapter 13 Plan. On Schedule A–Real Property, he listed an ownership interest in a single family home located at 34 Messinger Street, Mattapan, Massachusetts (the "Property"), which he valued at $97,300.00. On Schedule B–Personal Property, the Debtor listed, *inter alia*, a claim against GMAC and Fannie Mae in the amount of $2,000, characterizing the claim as an "offset." On Schedule D–Creditors Holding Secured Claims, he listed four secured creditors: Fannie Mae as the holder of a first mortgage on the Property in the sum of $104,720.30; "GE Capital c/o LOG Asset Recovery Services, Inc." as the holder of a second mortgage on the Property in the sum of $14,750.00; Monogram Credit Card Bank of Georgia ("Monogram") with a judicial lien in the sum of $6,500.00; and the Boston Water & Sewer Commission with a statutory lien in the sum of $733.84. On Schedule F–Creditors Holding Unsecured Nonpriority Claims, the Debtor listed a single creditor, Tremont Credit Union f/k/a Massachusetts Federal Credit Union, with a claim in the sum of $5,246.81. On Schedules I and J–Current Income and Expenses of Individual Debtors, the Debtor disclosed that he was a school teacher with the Boston Public Schools on disability leave. He indicated that his net monthly income was $3,773.00 and that his monthly expenses totaled $2,758.11, leaving excess monthly income of approximately $1,000.00 to fund a Chapter 13 Plan.

On January 25, 1999, the Debtor filed his First Amended Chapter 13 Plan pursuant to which he proposed to pay, through his plan, mortgage arrearages of $1,821.21

---

1. By order dated April 5, 1999, the Court consolidated disposition of GMAC's objection to confirmation of the Debtor's First Amended Chapter 13 Plan with this adversary proceeding.

2. Fifty-eight exhibits were marked and submitted. Exhibits numbered 47, 48 and 57 were withdrawn prior to trial and not introduced into evidence.

to Fannie Mae.[3] The Debtor also proposed to pay $2,658.24 to G.E. Capital Mortgage Services pursuant to an Assented to Motion to Compromise Claim and Modify Rights of Creditor G.E. Capital Mortgage Services, which motion was approved by this Court on March 3, 1999.

The Debtor proposed to pay certain secured claims directly, namely a monthly mortgage payment of $933.11 to Fannie Mae; a lump sum payment of $2,000.00 to G.E. Mortgage Capital Services and a lump sum payment of $733.84 to the Boston Water & Sewer Commission. The Debtor also represented that he would pay 100% of his unsecured claims, including the unsecured claim of Monogram arising from the avoidance of its judicial lien pursuant to 11 U.S.C. § 522(f) and the unsecured claim of Boston Edison, an added creditor, with a claim in the sum of $224.33.

GMAC filed an objection to the Debtor's First Amended Chapter 13, stating that its prepetition arrearage was $10,723.61 as set forth in its proof of claim filed on February 9, 1999.[4] It also observed that its claim was the subject of this adversary proceeding.

B. *Facts Giving Rise to the Debtor's Complaint*

The Debtor is a retired, sixty year old, former music teacher with the Boston Public Schools. At the time he commenced his Chapter 13 case, he was on disability leave. At the time of trial, he had retired. He purchased his home in Mattapan in 1971 with financing provided by the Charlestown Savings Bank. (Ex-

hibit 1).[5] On September 22, 1989, the Debtor borrowed $108,500.00 from Commonwealth Mortgage Corporation secured by a mortgage on the Property. (Exhibit 3). Proceeds of the loan were used to discharge Charlestown Savings Bank's mortgage. The note executed by the Debtor provided for interest at the rate of 10.625%, payable in monthly installments of $1,002.65, and contained a maturity date of October 21, 2019. Under the terms of the note, the Debtor was entitled to make full or partial prepayments of principal without penalty. Late charges were due and payable for payments made "by the end of 15 calendar days" after the due date, which was the first day of the month.

Fannie Mae acquired the note and mortgage granted by the Debtor to Commonwealth Mortgage Company, and, on July 17, 1992, GMAC acquired servicing rights for the loan. (Exhibit 6). When GMAC acquired servicing rights, the Debtor was in arrears with respect to his mortgage payments. (Exhibit 6, Trial Transcript, 1/5/00, p. 9).

In late 1992 and 1993, the Debtor stopped making mortgage payments for 13 months and contemplated filing a bankruptcy petition. (Transcript, 12/7/99, p. 65). In the fall of 1993, he requested a loan modification, which request was granted by GMAC's Loss Mitigation Department. Pursuant to a letter dated October 14, 1993 (Exhibit 4B), GMAC, through Kim Murphy, a Loss Mitigation Specialist, advised the Debtor that it had approved his request for a loan modification. In her letter, Ms. Murphy outlined the terms as follows:

3. The Debtor stated in his Plan the following with respect to the Fannie Mae/GMAC claim:
   The arrearage obligation to the first mortgagee is . . . comprised of the five monthly mortgage payments (which the creditor previously refused to accept), adjusted to take account of [sic] the creditor-alleged underpayment of $8.82/month since to [sic] October, 1993, *minus* the Chapter 13 Trustee's fee which the Debtor has been forced to incur because of the creditor's actions and $2,000.00 in damages by way of set off.

4. The proof of claim deadline established by the Court was January 20, 1999. The Debtor commenced the instant action against GMAC and Fannie Mae on October 9, 1998, and the Defendants filed their answer to the First Amended Complaint on November 27, 1998. That answer may be treated as an informal proof of claim.

5. The Debtor is divorced. He acquired sole title to the Mattapan Property on April 15, 1981. (Exhibit 1).

1. Fixed rate mortgage to a modified fixed mortgage.
2. Current interest rate of 10.625% to 7.625% for the remaining term of the loan.
3. The payment change will be effective with the October 01, 1993.[sic]
4. There will be a modification process fee of $500.00 which has been received.
5. The term of the loan will be extended by thirteen months.[6]
6. The delinquent escrows must be brought current by the mortgagor in the amount of $2,109.52 (received).
7. The mortgagor will be responsible for attorney's fees of $3,287.46 (received).

GMAC, through Ms. Murphy, also advised the Debtor that his new, monthly principal and interest payment would be $768.69 and that the escrow payment for insurance and taxes would be $153.02. On November 4, 1993, the Debtor executed the Loan Modification Agreement, which reflected a principal balance of $106,843.32 and a maturity date of November 1, 2020. (Exhibit 4A).

The Debtor made regular payments under the Loan Modification Agreement for approximately four years until August of 1997 when he failed to make two mortgage payments. (Exhibits 12 and 13).[7] At this point in time, the Debtor had incurred late charges totaling $607.11. (Joint Pre–Trial Memorandum at ¶ 11). The Debtor testified that he missed the mortgage payments in the summer of 1997 because he needed to have the Property repainted.

In September of 1997, the Debtor contacted GMAC about the missed August and September payments. (Exhibit 5, entry for 9/24/97). GMAC maintained a record of contacts made by the Debtor called a Collection History Report. In addition to entries prepared by GMAC employees, it contained automated or computer generated entries pertinent to the Debtor's loan. This record, in which the Debtor is referred to as "MR," reveals the fóllowing:

TELEPHONED. CONVERT OTHER DLQ REASON: .. [8]
MR CLD IN. VERIFIED RES PHONE AND ADRESS. MR STATED HE WANTED TO SEND IN 1200 A MONTH TILL CURRENT. ADVSD HIM THAT WOULD NEED FINANCIALS AS WOULD TAKE ABOUT 6 MONTHS. MR DID NOT WANT TO DO, SD WOULD SEND IN OCT ONE PAYMENT. ADVSD OF BREACH. ADVSD REPAY. MR WANTED TO GIVE FINANCIALS. ADVSD MR TO GET TOGETHER. MR SD WOULD DO NOW. RECOMENDED CALLING BACK. MR GOT TOGETHER. *TOOK ABOUT 20 MIN TO GET FINANCIAL INFO* AS MR NOT COMPLETELY SURE ON ELECTRIC. ADVSD MR WITH SURPLUS SHOULD BE ABLE TO DO IN 3 MONTHS. MR SD IMPOSSIBLE. ADVSD NEED MOR ACCURATE INFO THEN. ADVSD MR WOULD SET FOR 6 MONTHS. NEED SIGNED REPAY WITH FIRST PAYMENT OR WOULD BE RETRND. ADVSD NEEDS TO SEND DEPOSIT O/N TO BE IN ON THE 18TH. ADVSD WOULD EFFECT CREDIT. INCLUDES ACCRUING L/C BUT NOT PAST DUE. ADVSD WOULD VOID IF ONE DAY LATE OR NSF. MR STATED THAT HE DOES NOT LIKE CREDIT IS-

---

6. This was the number of delinquent payments on the Debtor's account. (Exhibit 4A).

7. During the period between 1994 and 1996, the Debtor routinely made his mortgage payments around the middle of the month. In 1994, he made one payment after the 15th of the month; in 1995, he made five payments after the 15th of the month and in 1996, he made nine out of 12 payments after the 15th of the month. (Exhibit 6).

8. This seemingly meaningless phrase appears in virtually all the entries in the Collection History Report. It pertained to the conversion of a previous computerized tracking system to the one in use at the time pertinent to this case. Additionally, in the Collection History Report, GMAC employees used a shorthand system for recording information that deleted many vowels and capitalized all words.

SUE. ADVSD MR SHOULD PLAN TO SAVE 300 A MONTH TO PAY MORTGAGE IN THE SUMMER AS HE IS A TEACHER. MR SD HE DID BUT HOUSE NEEDED PAINTING AND COST HIM 1400 TO HAVE DONE. DINNEBIER BRENT

(Exhibit 5, entry for 9/24/97)(emphasis supplied). By letter dated September 26, 1997, GMAC, through its Senior Loan Counselor in the Collection Department, Tuana Hart, forwarded a repayment agreement to the Debtor, stating "Please review the enclosed schedule, sign the original document and return it to the address listed below." (Exhibit 14). The address designated in the letter was the Payment Processing Center at GMAC's Waterloo, Iowa headquarters. Despite the reference to a repayment schedule, none was enclosed.[9] Nevertheless, the Debtor entered into a forbearance agreement with GMAC which agreement was subject to the following provisions set forth in the letter of September 26, 1997:

1. Payments must be received on or before the due date of the repayment program.

2. All payments must be mailed to:
   GMAC Mortgage Corporation
   Attention: Payment Processing
   Center 3451 Hammond Avenue
   Waterloo, IA 50702

3. This Repayment program does not include outstanding late charges, and does include late charges for the duration of the repayment plan.

4. All outstanding fees are paid in conjunction with your monthly payments while on the repayment program.

5. Your credit rating will be affected until your loan is on a current status.

6. If your account is analyzed during the program for taxes and insurance, an adjustment may be required in your repayment amount.

7. It is possible that outstanding fees have not yet been charged against your account ... when this plan was established. An adjustment to the plan may be necessary.

8. Default notices will continue to be sent for the duration of the program.

The September 26, 1997 letter also contained the following language required by the FDCPA: "Notice—This is an attempt to collect a debt and any information obtained will be used for that purpose."

In accordance with the forbearance agreement and the agreed schedule, the Debtor made the following payments to GMAC:

| | |
|---|---|
| October 21, 1997 | $1,200.00 |
| November 15, 1997 | $1,300.00 |
| December 17, 1997 | $1,267.00 |
| January 17, 1998 | $1,267.00 |
| February 17, 1998 | $1,267.00 |
| March 17, 1998 | $1,267.00 |
| April 13, 1998 | $ 924.29 |

(Joint Pre–Trial Memorandum at ¶ 13). Although the Debtor made the above payments, as will be explained below, all were not allocated to his monthly mortgage payment under the forbearance agreement

9. The Collection History Report reveals that the Debtor was agitated about the date the first payment was due under the forbearance agreement. It contains the following entry for October 20, 1997:

TELEPHONED .CONVERT OTHER DLQ REASON: ..
RCVD CL FROM MR ... ARGUED & ARGUED W/ME THAT BRENT TLD HIM HE COULD CL & MOVE THE PYMT DATES ... TLD MR THT CNNT CHNG REPAY DATES ... MR WNTD TO SPK TO BRENT .. TLD HIM BRENT ON ANTHR CL ... KPT DMDNG TO SPK W.BRENT .. BRENT WS ON ANTHR CL & SD TO XFR TO VM .. TT MR .. AGREED TO MOVE UNTIL 10–23 ... MR WNTD TO MOVE LONGER ... TLD MR REFUSE TO MOVE ANY LONGER THAN THE 23RD .. HE KPT ARGUING W/ME .. ADVSD HIM THIS IS NT AN ISSUE THT CN BE DEBATED .. TLD HIM THT HS UNTIL 23RD & WL ND TO SND O/N ML ON 10–22 OR WUGC ON THE 23RD AND THT IS FINAL ... ALSO TLD MR ND TO HV SIGND REPAY LTR W/DEPOSIT OR WL NOT ACCPT ....—REASON MR WNTD TO MOVE DATE IS THT HIS CHK HSNT BN CLRD BY THE BANK YET & CNT GET THE FUNDS—SCHAEFER THERES
(Exhibit 5, entry for 10/20/97).

which included sums necessary to make up the missed August and September 1997 payments. The reason for this was a letter sent to the Debtor, dated October 14, 1997, from GMAC's Loan Audit Department advising the Debtor that GMAC had discovered that its calculation of the principal and interest payment under the Loan Modification Agreement "executed on October 14, 1992[sic]" was incorrect "due to using an incorrect remaining term of 339." (Exhibit 16A). GMAC, through Boyd R. Borton, further advised the Debtor that "[t]he correct P & I payment is $777.51 based on a correct remaining term of 326." Mr. Borton went on to state the following:

> In light of this discrepancy, GMACM [sic] contacted the investor who approved the original modification agreement, and requested we be allowed to modify the current P & I payment to a fully amortizing payment or to extend the maturity date to eliminate a balloon payment. Both requests were denied. Your modification agreement stipulates in Section 2.[sic] "If on November 01, 2020 (the "Maturity Date"), the borrower still owes amounts under the Note and the Security Instrument, as amended by this agreement, the borrower will pay these amount [sic] in full on the Maturity Date." If this discrepancy is not corrected your loan will have a balloon balance of $10,262.18 due on the maturity date of your loan. Enclosed is an amortization schedule detailing this figure.[10]

To prevent the balloon balance at maturity GMACM [sic] is advancing $1,622.40 to reduce your principal balance from $102,063.48 to $100,441.08 after the August 01, 1997 payment. This correction will prevent your loan from ballooning at the current principal and interest payment amount, however, *it creates a negative suspense account which must be repaid by you.* Enclosed is the amortization schedule supporting this reduction amount.

GMACM is offering the following options to assist you in repaying the negative suspense amount of $1,622.40:

___ 1. Pay the entire amount of $1,622.40 in the enclosed postage paid envelope.

___ 2. Pay the amount in 6 monthly installments of $270.40 beginning with the December 01, 1997 payment.

___ 3. Pay the amount in 8 monthly installments of $180.27 and 1 monthly installment of $180.24 beginning with the December 01, 1997 payment.

Please select which option you prefer, sign and return this letter in the enclosed postage paid envelope by October 31, 1997....

(emphasis supplied).

Mr. Borton closed his letter by designating John Meinecke ("Meinecke") as the person the Debtor should contact if the Debtor had questions or concerns. The letter did not contain a FDCPA notice advising the Debtor that GMAC was attempting to collect a debt and that any information would be used for that purpose.

Meinecke testified at the trial. He testified generally that GMAC worked with mortgagors to avoid foreclosure proceedings. (*See also* Exhibits 52, 53 and 54).[11]

---

**10.** The Court does not know whether the amortization schedule detailing this figure was enclosed or not. The amortization schedule was not attached to Exhibit 16A, and the Court questions how the $8.82 differential in monthly payments could mushroom into a balloon payment of the magnitude stated by GMAC. Assuming that the Debtor had continued making monthly principal and interest payments of $768.69, rather than $777.51, the total amount of underpayments would be less than $3,000 when the loan matured. Thus, unless GMAC proposed charging interest on

interest (as the Court assumes a portion of the $8.82 would be applied to principal and a portion to interest in the same ratio as the monthly payment), the validity of the balloon figure appears questionable. The Debtor, however, has not challenged the amortization figure.

**11.** Chapter 4: Loss Mitigation Alternatives of Fannie Mae's Servicing Guide/Part VII: Delinquent Mortgages provides that "Fannie Mae does not want to foreclose a delinquent mortgage if there is a reasonable chance of

He also testified that he was the GMAC employee who had contacted "the investor," i.e., Fannie Mae, about modifying the current P & I payment to fully amortize the loan or to extend the maturity date to eliminate the balloon payment. In the October 14, 1997 letter, GMAC advised the Debtor that "[b]oth requests were denied." This representation was false. Contrary to GMAC's representation to the Debtor, a Fannie Mae employee had indicated to Meinecke that Fannie Mae would consider the requests if GMAC either "resubmitted a loan package or redid the financials." (Trial Transcript, 1/5/00, pp. 23–24). In other words, according to Meinecke, "the borrower would have to have another valid hardship." Meinecke also testified that the Loss Mitigation specialist with whom he spoke at Fannie Mae did not advise GMAC to advance $1,622.40 in principal. Thus, GMAC personnel unilaterally decided to prepay the principal on behalf of the Debtor. Moreover, Meinecke reasoned that it would be a burden for the Debtor to submit financial data to establish a hardship, although GMAC's own computer records indicated that 1) the Debtor had submitted, at least verbally, sufficient financial data to establish a hardship on September 24, 1997, thereby justifying the September 26, 1997 forbearance agreement; and 2) the Debtor was "over obligated." (Exhibit 5, entries for 9/24/97 and 12/17/97).

The Debtor testified that he did not understand the October 14, 1997 letter

from the Loan Audit Department and called GMAC after receiving it. Nevertheless, GMAC had in its file a copy of the October 14, 1997 letter signed by the Debtor on November 15, 1997 with the third option selected. Apparently, upon receipt of a response from the Debtor, Deb Becker of GMAC's Loan Audit Department sent the Debtor a follow up letter, dated November 25, 1997, enclosing nine postage prepaid envelopes. She stated the following in her letter:

> To assist you in making your monthly installment of $180.27/$180.24, I have enclosed 9 postage paid envelopes. Please use these envelopes when making your December 1, 1998[sic] and August 1, 1998 payments [sic]. For your convenience you may also enclose your regular monthly payment with your monthly account statement coupon. Just be sure to add $180.27/$180.24 to each payment amount. Using these envelopes will ensure your account is updated correctly.

(Exhibit 17). In closing her letter, Deb Becker advised the Debtor to call a toll free number if he had any questions.

Approximately three weeks later, on December 17, 1997, the Debtor contacted GMAC's Collection Department, not its Loan Audit Department, with respect to the envelopes that he had received. The Collection History Report reflects the following entry:

avoiding foreclosure. If the reason for default appears to be long-term or too serious for short-term relief measures to be effective, the servicer should consider our permanent foreclosure prevention alternatives." (Exhibit 52, p. 1). Fannie Mae's Servicing guidelines provide that servicers must establish a system for servicing delinquent mortgages. That system, according to Fannie Mae, must include, *inter alia*, "guidelines for the individual analysis of each delinquency," "counseling procedures to advise mortgagors how to avoid or to cure delinquencies," "instructions and adequate controls for sending delinquent notices, assessing late charges, returning partial payments, maintaining collection histories, reporting delinquencies to credit bureaus, etc.," and "management review procedures to eval-

uate both the mortgagor's actions and the servicer's collection efforts before a final decision is made to accept some form of repayment arrangement or to start liquidation proceedings." (Exhibit 53, p. 1). The guidelines indicate that "the servicer only needs to send the mortgagor a *late payment notice* for any payment that has not been received by the 16th day after it is due." (Exhibit 53). Further, the guidelines provide that imposing late charges "may not be effective as a collection tool when the mortgagor is simply unable to make the payment because of some unforeseen circumstances." Moreover, the guidelines authorize the servicer to defer late charges, although "the servicer cannot foreclose the mortgage later if the only delinquent amount is unpaid late charges." (Exhibit 53).

THE MORTGAGOR TELEPHONED OUR OFFICE

MORTGAGOR IS OVEROBLIGATED. MR VRY HRD TO UNDRSTND (STATIC ON PHNE), MR WNTED TO KNW WHT RPY PMT, ADV MR IS 1267.00, MR SD THT HS LTTR W/9 PSTAGE PD ENVS AND SYS TO SND XTRA $180, ADV MR THT DO NT SEE THT ON ACCT, ADV MR TO SND 1267 TDAY O/NITE TO WLOO STRT ADDRSS, GVE MR ADD, MR SD OK.

(Exhibit 5, entry for 12/17/97). The entry establishes that the Collection Department did not have, or was not aware of, computer access to records of the Loan Audit Department with respect to the Debtor's account.

Although the Debtor testified that he threw away the postage paid envelopes, the Loan Audit Department received the February 1998 payment made by the Debtor under the forbearance agreement. In addressing an Express Mail envelope to GMAC, the Debtor did not specify a particular department at GMAC's Waterloo headquarters, and the Debtor's receipt, dated February 17, 1998 (Exhibit 20), reflects that fact. The February receipt is identical in all material respects, except obviously for the date, to the receipt for the January 1998 payment under the forbearance agreement which was not misdirected. (Exhibit 18).

GMAC maintained a Transaction Ledger in addition to the Collection History Report in 1997 and 1998. That ledger reflects that GMAC received a payment from the Debtor in the amount of $1,267.00 on February 20, 1998. (Exhibit 21). That payment was consistent with the payment amount the Debtor was obligated to make under the forbearance agreement. It evidenced the Debtor's intent to comply with the forbearance agreement. It did not evidence an intent to make a regular monthly payment of $924.20 plus $180.27 under the repayment agreement with the Loan Audit Department.

Without questioning why the Debtor was making a payment that did not comport with the repayment agreement, GMAC, on February 20, 1998, applied $342.71 to the negative suspense account created by its principal payment of $1,622.40 to Fannie Mae and placed the balance of the Debtor's $1,267.00 forbearance payment (i.e., $924.29) in another suspense account. (Exhibit 22). Thus, the mortgage account statement that GMAC sent to the Debtor, dated February 23, 1998, reflected a total amount due of $3,021.55 (Exhibit 22) and the Collection History Report reflected that the forbearance agreement had been breached ("Forbearance broken"). (Exhibit 5, entry for 2/23/98).

The next day, GMAC sent the Debtor a letter canceling the forbearance agreement (Exhibit 23), although its own Collection History Report contained the following entry:

THE MORTGAGOR TELEPHONED OUR OFFICE

OTHER DLQ REASON: REPAY.

THERE IS A NEG SUSP BLNC OF $1279.69. CINDY PAPE AND TRISHA LKED OVER THE ACCT WITH ME, *CAN'T FIGURE IT OUT*, WLL HV SCOTT LATHROP LOOK AT IT. MR WS RETRNING OUR CLL-TLD HIM MAY HAV BN A ROUTINE CALL BECZ THE ACCT SHOWS DLNQNT. HE IS REALLY MAD, SD WE WSTE HIS VALUABLE TIME. TLD HIM WE ND TO GET THE ACCNT STRGHTND OUT, WLL CLL HM WHEN IS FIXED. HE SD HE DSN'T WNT ANYONE TO CLL HIM, JUST TO LV A MSSG ON HIS MACHINE SAYING IT IS OK NOW. VRFD ALL, TH IN PROP.

(Exhibit 5, entry for 2/24/98) (emphasis supplied). Even though GMAC's Collection Department recognized that there was a problem on February 24, 1999, GMAC applied a portion of the Debtor's February forbearance payment (i.e., $404.55) to late charges and charged him $8.00 for an in-

spection report. (Exhibit 24). The Collection History Report also contains the following notation on February 24, 1998: "FACE TO FACE INTERVIEW WITH THE MORTGAGOR AT THE PROPERTY. THE MORTGAGOR WAS INDIFFERENT. MODIFICATION/RECAST IS NOT APPLICABLE. COMPLETED A PIR/CFS & ASSESSED FEE, LEFT A CARD TO CALL US." Four days later, GMAC personnel noted that the Debtor contacted the Collection Department:

THE MORTGAGOR TELEPHONED OUR OFFICE
OTHER DLQ REASON: SD HARASSMENT.
MR CLD ADVSD THAT HE GT ANTHR CL AFTR HD TT DIAHN .. APOLOGIZD TO MR AND HE ADVSD THAT HE IS CNTCTNG HS ATTY AS THIS IS HARASSMENT ADVSD MR THAT AS SOON AS THE PROB IS CRRCTD/FIGRD OUT HE WL BE CNTCD..TK OUT OF DAVOX 10 DYS TO GVE TME TO RESEARCH..MR SD IS CNTCTNG HS ATTY..VER A/P, OWNER OCC MLNG GOES TO PO IN BOSTON..

(Exhibit 5, entry for 2/28/98).

The Debtor sent his March forbearance agreement payment to GMAC and that payment was reflected on the Collection History Report. (Exhibit 5, entry for 3/19/98). On March 23, 1999, the Collection Department sent the Debtor a letter advising him that he was in default due to non-payment of his February 1, 1998 installment and that the amount required to bring his loan current was $3,065.30. (Exhibit 25). It sent him a virtually identical letter on April 20, 1998, following receipt, on April 15, 1998, of his April forbearance agreement payment, this time advising him that the amount necessary to bring his account current was $3,088.36. (Exhibit 26). Both of these letters contained the following language: "Notice—This is an attempt to collect a debt and any information obtained will be used for that purpose."

Less than 10 days later, on April 29, 1998, Deb Becker from GMAC's Loan Audit Department sent the Debtor a letter "in follow-up to our agreement regarding your negative suspense account." (Exhibit 27). She advised the Debtor that he owed $180.27 for the March 1, 1998 and April 1, 1998 payments, adding "the repayment made for the December 1, 1997, January 1, 1998 and February 1, 1998, payments of $342.71 was short $198.10. Your suspense repayment is now in arrears $558.64." (Exhibit 27). GMAC proceeded to provide the Debtor with three payment options.

Then, on or around May 1, 1998, GMAC's Escrow Analysis Department sent the Debtor a letter advising him that it had analyzed his escrow account and found a surplus of $2.67. It offered him four options with respect to a refund. (Exhibit 28). In the meantime, on April 29, 1998, GMAC's Collection Department had discovered the error in calculating the principal and interest with respect to the Loan Modification Agreement and had attempted to contact Meinecke, who was out of the office. (Exhibit 5, entry for 4/29/98).[12]

On May 19, 1998, the Collection Department recognized that the Debtor had completed his payments under the forbearance agreement. This entry and subsequent entries in the Collection History Report between May 19, 1998 and June 2, 1998, when the Debtor's loan was transferred to foreclosure, reveal the following:

05/19/98 ON CAL TO CK TELEPHONED OUR OFFICE OTHER DLQ REASON: MISAPPLICATION COPY OF ACCNT TO SCOTT L TO RSRCH AS THERE WS $1622.40 TO PRINC CURTAILMENT 10/14/97 & ACCT SHWS NEG $1279.69 IN SUSP BLNC.. CUS DSNT WNT TO B CLD UNTL PRBLM RESLVD THEN WE ARE TO LV MSSG ON HS ANWSRNG MCHN ... *LOOKS AS THO HE DID CMPLT FRBRNC...*

05/19/98 J MEINECKE TELEPHONED OUR OFFICE LWTC FOR JOSEPH; 1622.40 IS FOR ADVANCE TO MAKE LOAN PROPERLY AMORTIZE SINCE LOAN WAS CALCULATED WRG WHEN IT WAS MODIFIED; CUSTOMER HAS SIGNED REPAY AGREEMENT IN LOAN AUDIT DEPARTMENT

05/21/98 COMMENT TELEPHONED OUR OFFICE ON CUSACCSUMI $924.29 WS PUT IN S007 ON 2/20 ...BROT TO JOHN MEINECKE'S

12. Indeed, the Collection History Report reflects attempts to contact Meinecke at home.

ATTN...HE DISCUSSD W/KRIS CAYA & THEY DNT WNT U.S. TO USE THESE FUNDS FOR A MO PMNT... JOHN WL CONINU TO GET AHOLD OF CUS

(Exhibit 5) (emphasis supplied).

On May 22, 1998, GMAC's Collection Department returned the Debtor's check in the sum of $924.29, which he had sent to GMAC for his May mortgage payment because it represented "only one of three installments that are owing at this time." (Exhibit 30). On June 8, 1998, GMAC's Loss Mitigation Department wrote to the Debtor advising him that foreclosure proceedings had been initiated. (Exhibit 31). On June 12, 1998, Richard J. Fidler, Esq. of Harmon Law Offices wrote to the Debtor formally notifying him of Fannie Mae's intention to foreclose its mortgage pursuant to the provisions of Mass. Gen. Laws Ch. 140, § 90B. (Exhibit 32). On July 9, 1998, Francis J. Nolan, Esq. of Harmon Law Offices forwarded the Debtor, by certified mail, a copy of the Order of Notice in connection with the foreclosure. (Exhibit 33). On July 29, 1998, Harry P. Kapp, Esq. of Harmon Law Offices advised the Debtor that the total amount necessary to reinstate his mortgage was $8,753.42, which sum included, *inter alia*, a "principal repay shortage of $1,279.69," as well as legal fees and costs totaling $1,662.15. (Exhibit 34). On August 6, 1998, Holly L. Raiano, Esq. of Harmon Law Offices advised the Debtor that Fannie Mae intended to foreclose its mortgage on or after September 2, 1998. (Exhibit 35).

The Debtor employed an attorney, Francis W. Quinn, Esq., with respect to GMAC's collection efforts, although it is unclear exactly when Attorney Quinn began performing services on behalf of the Debtor with respect to this matter. On August 10, 1998, Attorney Quinn faxed Harmon Law Offices copies of checks written by the Debtor establishing that the Debtor had made payments in the amount specified in the forbearance agreement. (Exhibit 36). This effort did not derail Fannie Mae's decision to foreclose, and the foreclosure sale was duly advertised for September 2, 1998. (Exhibit 37). The Debtor filed his Chapter 13 petition on September 1, 1998. Upon learning of the bankruptcy filing, a paralegal at Harmon Law Offices informed Debtor's counsel, in a letter dated September 2, 1998, that the foreclosure sale had been postponed until December 2, 1998. (Exhibit 39).

Debtor's counsel repeatedly requested accountings from Harmon Law Offices. On October 9, 1998, he sent the firm a demand for relief under Chapter 93A. Harmon Law Offices mailed a response to the Chapter 93A letter to Debtor's counsel on November 10, 1998. The response was prepared five days after Kris Caya, a GMAC supervisor, prepared a memorandum with respect to the Debtor's loan in which she stated the following:

> Obviously there was miscommunication between the 3 departments. Loss Mitigation and Loan Audit were concerned with the advance only. Although not applied as intended, *no one discovered the repayment payments were made prior to transferring the loan to foreclosure.* Note: the customer has never made a payment of $180.24 toward the advance. Perhaps the customer was confused with both repayment plans being established by 2 different [sic] at almost the same time?

(Exhibit 43) (emphasis supplied). The memo was not entirely accurate. According to the Collection History Report, the Collection Department recognized that the Debtor had complied with the forbearance agreement on May 19, 1998 in ample time to prevent the loan from being transferred to foreclosure in June of 1998.

C. *GMAC's Computer System and Payment Processing*

Two witnesses from GMAC testified about GMAC's systems and the Debtor's loan: Meinecke and Mary Sand ("Ms. Sand"). Ms. Sand, a business analyst with experience in GMAC's Loan Audit and Payment Processing Departments, stated that the three options outlined in the October 14, 1998 letter to the Debtor were not cast in concrete. She testified that if

mortgagors called GMAC, "we worked out something else with them if they just couldn't handle it." (Transcript, 1/5/00, p. 94). Indeed, she stated that under certain circumstances GMAC permitted mortgagors to make a balloon payment.

With respect to the repayment agreement, she testified that the only way that the Loan Audit Department would have gotten the Debtor's February forbearance agreement payment would be if the Debtor used the postage prepaid envelope addressed to the Loan Audit Department. She stated that regular payments are handled by the Payment Processing Department. In the event a mortgagor fails to submit a coupon with his or her monthly payment, but the loan account number appears on the payment check, Payment Processing employees apply the payment to the loan with that loan number. She also testified that if a loan "goes on a formal repay plan, there is a cash intercept put on the loan." (Transcript, 1/5/00, p. 100). In other words, a warning would appear on the computer screen of the employee processing the payment. She stated that if the payment amount failed to match the payment required under the repayment or forbearance agreement, the employee was required to examine the Collection History Report to ascertain whether the payment could be accepted. (Transcript, 1/5/00, p. 101). This system was not in place with respect to Loan Audit Department repayment agreements, however. That department relied solely upon postage prepaid envelopes.

Ms. Sand also explained the reason for the inability of the various GMAC departments in Waterloo to communicate with one another. She stated that "part of the confusion was with our conversion to the new [computer] system.... We went from one mortgage servicing system to another, and they mapped over certain comments, which you guys have seen, as you've been trying to read them, that they don't all necessarily make sense with that telephone information there." (Transcript, 1/5/00, pp. 103–04). In other words, there were two different computer systems: "TRACKS," which was available to Loan Audit and Customer Service personnel, and "D.L.M.I.," which was available to Collection Department personnel. Ms. Sand indicated that she became aware of the need to examine both systems in January of 1998, but "it was further down the line as we were starting to get the word out to other people that they needed to be looking at the other system, also." (Transcript, 1/5/00, p. 104). Thus, although it may have been possible for personnel in one department to access data collected by other departments, in the case of the Debtor's loan, the Loan Audit Department was unaware of the Debtor's forbearance agreement with the Collection Department. Thus, in applying the Debtor's February payment in the fashion that it did, the Loan Audit Department triggered a default under the Debtor's forbearance agreement. Moreover, the Collection Department was unaware of the Debtor's "agreement" to repay the $1,622.40 advanced by Loan Audit to Fannie Mae and advised the Debtor on December 17, 1997 to make his forbearance payment of $1,267.00, without promptly investigating the Debtor's questions about the additional repayment obligation of $180. In short, at GMAC, the right hand did not know what the left hand was doing, and the Debtor, who at one time or another received correspondence from GMAC's Loan Audit, Collection, Loss Mitigation and Escrow Analysis departments, some of which was conflicting and some of which would be meaningless to the average person (i.e., "negative suspense account," "escrow surplus"), simply made the payments that he agreed to make under the forbearance agreement and refused contact with GMAC until it straightened out his account. In summary, the Debtor did what he was instructed to do on December 17, 1997, namely make payments in accordance with the forbearance agreement, and GMAC did not do what it promised the Debtor that it would do on February 24, 1998, namely straighten out his account.

### D. GMAC's Legal Status

GMAC is a "debt collector" within the statutory definition of the Fair Debt Collection Practices Act and a licensed collection agency pursuant to G.L. c. 93, § 15. (Joint Pre–Trial Memorandum, ¶ 6). Moreover, GMAC regularly does or solicits business in Massachusetts, and has done so since at least September 1, 1997. (Joint Pre–Trial Memorandum, ¶ 25).

### E. Testimony Pertinent to the Debtor's Claim for Damages

The Debtor testified that he had a thyroid problem and a "nervous disorder" and that he was angry, frustrated, and distressed by GMAC's conduct. His testimony was corroborated by that of Attorney Quinn who observed the Debtor's agitated state. Attorney Quinn stated that he met with the Debtor at least a half dozen times and went to his home on a number of occasions to avoid the need for the Debtor to drive to his office.[13] His testimony was also corroborated by the Collection History Report entries, which reflect the Debtor's frustration beginning with the entry for February 24, 1998.

The Debtor did not testify that he sustained any physical harm or that he experienced any physical symptoms as a result of the problems with the mortgage. He did not incur any medical bills or other expenses on account of the distress he claims was the result of the Defendants' conduct.

### F. The Debtor's Chapter 93A Letter and the Defendants' Response

The Debtor, through his counsel, directed a Chapter 93A letter to both Fannie Mae and GMAC on October 9, 1998, the same day he filed the instant adversary complaint. In his letter, the Debtor, through counsel, attached a copy of the adversary complaint and outlined the conduct he alleged violated Chapter 93A. Additionally, Debtor's counsel described the Debtor's injuries, including emotional distress on account of the unilateral attempts to increase his current payment obligation under his mortgage, the assessment of late charges, penalties and attorney's fees, the refusal to accept payments beginning in May of 1998, as well as the commencement of foreclosure proceedings, and the costs and expenses associated with filing Chapter 13 and utilizing the limited benefits available to him under the Boston Teachers Union Prepaid Legal Services Plan. He demanded the following from the Defendants:

(a) that you tender $100,000.00 in damages, including ... damages on account of emotional distress;

(b) that you waive all interest accrued on the Obligation since May 1, 1998 when you refused to accept his tender of mortgage payments, as well as all outstanding late charges, penalties, costs and attorney's fees otherwise claimed by you;

(c) that you agree to accept current mortgage payments in the amount of $924.29/month (commencing with the payment due October 1, 1998), and a scheduled Chapter 13 Plan arrearage of $4,621.45 (reflecting mortgage payments due for the months of May, 1998—September, 1998), the same, after further adjustment as described in (d), *infra*, to be accepted in full satisfaction of the Debtor's pre-bankruptcy arrears;

(d) that you assume liability for all costs and expenses associated with Mr. Hart's bankruptcy, including the Chapter 13 Trustee's fees; and

(e) that you waive any claim to a payment on account of the alleged error described in your letter of October 14, 1997—whether through a balloon payment, present lump sum payments, or an extension of the mortgage term....

---

**13.** Attorney Quinn testified that he met with the Debtor a number of times and observed his neurological problems, "scary" driving, and overwrought emotional state.

Fannie Mae and GMAC, utilizing Harmon Law Offices, responded to the Debtor's Chapter 93A letter in a letter dated November 10, 1998 addressed to the Debtor's counsel. The Defendants outlined their disagreement with the Debtor's position but stated the following:

Although GMAC and Fannie Mae believe that you have not set forth an a[sic] factual basis to recover under Massachusetts General Laws, ch. 93A, they have authorized this office to offer the following to settle this matter:

1. GMAC will remove the loan from foreclosure default status.

2. GMAC will waive all bankruptcy and foreclosure fees and costs incurred to date.

3. GMAC will agree to waive its claim to the amount due for the error in amortization in the loan modification agreement. Thus, your clients [sic] will be obligated only for the erroneous principal and interest payment of $768.69 set forth in the 1993 loan modification agreement.

4. GMAC will reset the loan so that it is due for the June 1, 1998 payment.

5. GMAC will agree to institute a repayment plan so that Mr. Hart can make up any payment arrearage from June 1, 1998 forward.

## III. POSITION OF THE PARTIES

### A. *The Debtor* ·

The Debtor makes nine main arguments in support of his claims for relief and damages. With respect to Count I of his Second Amended Complaint pursuant to which the Debtor asserts a breach of contract claim, the Debtor, in his post-trial Memorandum, recognizes that he did not specifically address the claim. He states that he intends to rely on the statement of the claim set forth in the Second Amended

Complaint and the facts adduced at trial "with the additional observation that there was no legitimate contractual basis which justified the Defendants' conduct including the refusal to continue to accept the Debtor's tender of mortgage payments." [14]

With respect to his second count, the Debtor maintains that G.L. c. 183, § 60 is applicable to the facts of his case and that the statute affords him an automatic extension of the term of his loan. While recognizing that the statute was amended in 1993 with an effective date in 1994, after he executed the Loan Modification Agreement with GMAC, the Debtor observes that the present version of the statute requires, if installment payments under a note and mortgage will not fully amortize the outstanding principal, "such note and its disposition at maturity shall be subject to automatic renewal or extension of the note *at the option of the mortgagor* and such conditions and restrictions imposed by the commissioner." G.L. c. 183, § 60 (emphasis supplied). The Debtor argues that he "does not believe the result would be different if the new version of the statute applied." Memorandum, p. 4 n. 3.

The Debtor next argues that GMAC violated a number of sections of the FDCPA (Count III), in particular 15 U.S.C. §§ 1692e(2)(A), (5) and 1692f(1). Noting that the standard for determining violations of the act is the "least sophisticated consumer" standard, the Debtor maintains that GMAC's October 14, 1997 letter falsely represented that Fannie Mae had denied permission to either adjust the monthly principal and interest payment or extend the term of the loan in order to remedy the $8.82 miscalculation of the principal and interest necessary to amortize his loan at maturity. The Debtor also argues the following:

---

14. In his Second Amended Complaint, the Debtor alleged that the Defendants breached the duty of good faith and fair dealing and, in particular, breached the contract embodied in the Note, Mortgage and Modification Agreement by seeking to collect monies in amounts

to which they were not entitled; in refusing to accept payments from the Debtor; in imposing charges on the Debtor which they were not entitled to impose; in failing to act in good faith; and in commencing a foreclosure under the foregoing circumstances.

Under no theory did the Debtor even owe $1,622.40 in October, 1997, given that payment each month of $8.82/month less than the sum required to fully amortize the loan by the note's stated maturity had, over a period of forty-nine (49) months since October, 1993, left "unpaid" only $432.18. The $1,622.40 demanded by GMAC in order to cause the Debtor to *pre-pay* principal on the loan was in no respect a debt which the borrower was then obligated to pay, and thus was a misrepresentation as to the "character, amount or legal status of [the debt]" within the meaning of 15 U.S.C. § 1692e(2)(A), and the attempted collection of an amount not "expressly authorized by the agreement creating the debt or permitted by law" as required by 15 U.S.C. § 1692f(1). This is the case notwithstanding the Debtor's alleged execution of the October 14, 1997 "repay agreement." The Debtor's putative assent to this arrangement was at best obtained by misrepresentation and through conduct violative of another FDCPA provision, 15 U.S.C. § 1692e(5)—insofar as predicated on the threatened balloon obligation—and thus must be regarded as a nullity.

Memorandum at pp. 7–8. The Debtor asserts that GMAC's conduct was fundamentally deceptive with respect to the balloon payment because under G.L. c. 183, § 60 he could have extended the term of the loan.

The Debtor also argues that GMAC's conduct in attempting to collect $1,622.40 from the Debtor, in misapplying his February 1998 mortgage payment, in canceling the forbearance agreement, in diverting the Debtor's February payment to pre-forbearance late charges, and in initiating foreclosure proceedings also violated the FDCPA. The Debtor maintains that it was "rather incredible" that Loan Audit would not investigate its receipt of a check in the sum of $1,267.00 from a borrower who, at least in its view, had agreed to pay $180.27 plus a regular mortgage payment of $924.29. The Debtor, observing that § 1692h of the FDCPA prohibits debt col-lectors from applying payments with respect to multiple or disputed debts except in accordance with the consumer's directions, also argues that GMAC was aware of how the Debtor had intended his February payment to be made prior to initiating foreclosure proceedings, and its conduct after April and May of 1998 was inexcusable under § 1692k(c). Finally, with respect to his claims under the FDCPA, the Debtor maintains that the continuation of foreclosure proceedings by Harmon Law Offices, after Attorney Quinn had faxed it copies of the Debtor's checks showing adherence to the forbearance agreement, amounted to conduct "the natural consequence of which [was] to harass, oppress, or abuse," 15 U.S.C. § 1692d and was unfair and unconscionable. Accordingly, the Debtor maintains that GMAC is liable for actual damages, including damages for emotional distress, embarrassment and humiliation under 15 U.S.C. § 1692k. Citing *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182, 184–86 (D.Del.1991), he argues damages under the FDCPA are statutory and that he need not meet the standards pertaining to tort claims.

The Debtor's third principal argument is that Fannie Mae is vicariously liable for GMAC's violations of the FDCPA, although he recognizes that by its terms the statute is only applicable to "debt collectors." The Debtor urges the Court to follow decisions such as *Rousseau v. Gelinas*, 24 Mass.App.Ct. 154, 159, 507 N.E.2d 265 (1987), wherein the state court found a principal, not independently subject to liability under Chapter 93A, to be vicariously liable for the acts of an agent.

The Debtor urges the Court to find Fannie Mae liable under TILA and the MCCCDA (Counts IV and V) because in his view the Loan Modification Agreement was a "refinancing" within the meaning of those statutes due to the undisclosed balloon obligation of $10,262.18. The Debtor argues that Regulation Z, 12 C.F.R. § 226.20(a), does not exempt the 1993

Loan Modification Agreement from disclosure because the maturity was lengthened and the number of payments increased beyond that remaining in the existing transaction, even though the existing transaction was not satisfied and replaced by a new obligation. He argues the following:

> In the present case, if 20 [12] C.F.R. § 226.20 is read to actually exempt all "workouts" in their entirety, so long as the existing obligation is not "replaced by a new obligation," and to do so even in those cases (i) where there has, for example, been an increase in the APR, (ii) where the amount financed *exceeds* the unpaid balance plus earned finance charge and insurance premiums, (iii) where the maturity is *lengthened,* and/ or (iv) where the payment amount or number of payments is *increased* beyond that remaining on the existing transaction—all circumstances identified in the regulation or staff commentary which would clearly trigger a disclosure if the old obligation is "replaced" by a new one—that would clearly constitute the exemption of an entire class of transactions, and not simply amount to defining the parameters of what appropriately ought to be disclosed, *how* and *when.*
>
> Given that what the Debtor contends *ought* to have been disclosed here would clearly have been *required* to be disclosed under any reading of 20 [12] C.F.R. § 226.20 where the existing obligation was "replaced by a new obligation"—even in the absence of any other changes in its terms—there is no rational purpose for having a creditor's disclosure obligation turn on that circumstance, and the regulation should not be so construed.

Memorandum, pp. 34–35 (emphasis in original). Based upon this reading of the regulation and staff commentaries, the Debtor, citing 15 U.S.C. § 1640(b); G.L. c. 140D, § 32(b), and *York v. Sullivan,* 369 Mass. 157, 165, 338 N.E.2d 341 (1975), asserts that he should not be required to pay anything in excess of the principal and .

interest "actually disclosed" at the time of the Loan Modification Agreement in full satisfaction of his obligation to the mortgagor. In other words, he wants to avoid any liability for a balloon payment at the maturity of the loan.

The Debtor next argues that Fannie Mae's postponement of the foreclosure sale on September 2, 1998 violated the automatic stay imposed by 11 U.S.C. § 362(a) upon the filing of the Chapter 13 petition (Count VI). Rejecting the majority approach as exemplified in *Zeoli v. RIHT Mortgage Corp.,* 148 B.R. 698 (D.N.H. 1993), the Debtor states that continuing the foreclosure sale generally, rather than to a date certain, would have been consistent with preserving the status quo. Instead, by postponing the sale to a date certain, Fannie Mae's conduct, in his view, "amounted to a gratuitous threat of action."

Finally, the Debtor maintains that the Defendants violated Chapter 93A and 940 Code Mass. Regs., § 3.16 (Count VII). The Debtor observes that conduct that violates the federal consumer protection acts presumptively violates G.L. c. 93A, §§ 2, 11. Moreover, he argues that any conduct that falls within a penumbra of statutory or common law concepts of unfairness also may violate the act.

With respect to his damages under Chapter 93A, the Debtor maintains that he is entitled to actual damages, including damages for emotional distress, and attorney's fees. Relying upon *Columbia Chiropractic Group, Inc. v. Trust Ins. Co.,* 430 Mass. 60, 712 N.E.2d 93 (1999), he argues that at least all or a portion of his attorney's fees may constitute traditional damages as the Debtor's bankruptcy was a consequence of the Defendants' conduct and may be doubled or tripled.

The Debtor also maintains that he is entitled to multiple damages because the Defendants' response to his Chapter 93A demand letter was inadequate and ambiguous. In particular, he suggests the Defendants' failure to offer him compensation

for his emotional distress was unreasonable and not a good faith response.

Finally, the Debtor argues that the Defendants' conduct was knowing and willful and that, with respect to GMAC's proof of claim, he owes no attorney's fees and costs, inspection fees, appraisal fees, or other charges. The Debtor further objects to prepetition late charges as they are not collectable as part of the arrearage in view of GMAC's policy of only collecting these obligations at the time of the final pay-off. Thus, the Debtor maintains that his mortgage arrearage at the time of the commencement of his bankruptcy case would be $4,621.20–the regular monthly mortgage payment of $924.24[sic] times five, representing the payments missed for May, June, July, August and September of 1998, less statutory damages, and the Chapter 13 Trustee's fees.

### B. The Defendants [15]

The Defendants moved for a directed verdict with respect to the Debtor's breach of contract claim, stating that the Debtor both failed to demonstrate any act or omission on their part which would constitute a breach of contract and failed to establish damages that were a proximate result of the breach of contract. With respect to Count II of the Debtor's Second Amended Complaint, the Defendants contend that G.L. c. 183, § 60 is inapplicable to the instant case. They argue that the original promissory note was not "of the type which is contemplated" by the statute. They state that GMAC did not attempt to collect the Debtor's obligations in an abusive manner or at unusual times or places and that because the Debtor did not ask GMAC to cease communications there was no violation of the FDCPA. Moreover, the

Defendants argue that GMAC was only attempting to correct an error which it had made.

The Defendants also maintain that as a matter of law Fannie Mae, which is the owner and holder of the Debtor's obligation, cannot be held vicariously liable for any of the Debtor's claims under the FDCPA because the FDCPA only applies to "debt collectors" entities that attempt to collect debts of others. The Defendants cite *Caron v. Charles E. Maxwell, P.C.,* 48 F.Supp.2d 932 (D.Ariz.1999), in support of their position that the purpose of the FDCPA was to eliminate abusive debt collection activities by debt collectors, not debt holders. They also point out that no cases support the Debtor's position with respect to vicarious liability.

With respect to the Debtor's TILA and CCCDA claims, the Defendants maintain the 1994 Loan Modification Agreement was not a refinancing that required additional disclosures. Relying on Regulation Z and Massachusetts analogous regulation, 209 C.M.R. § 32.20, they maintain that the Loan Modification effectuated a reduction in the annual percentage rate and corresponding change in the payment schedule and was exempt from the disclosure requirements of TILA and CCCDA.

The Defendants argue that they did not violate the automatic stay, emphasizing that it is common practice in Massachusetts to continue foreclosure sales that are stayed by the filing of Chapter 13 petitions to dates certain. They urge this Court to follow the majority view, which is that the mere postponement and rescheduling of the foreclosure sale does not violate the automatic stay as the mortgagee is merely preserving the status quo. The Defen-

---

**15.** In summarizing the Defendants' position, the Court has relied upon the Defendants' Motion for Directed Verdict filed on January 5, 2000, the Defendants' Requests for Rulings of Law filed on January 5, 2000 and the Defendants' nine-page Post–Trial Brief, in which the Defendants only address Counts III and VI of the Debtor's complaint. The Defendants' Motion for a Directed Verdict and Requests for Rulings, though outlining applica-

ble law, fail to integrate the law and the facts in a meaningful way. Indeed, the Defendants' Request for Rulings contains disconcerting references to parties not involved in this action. In contrast, the Debtor filed a 63–page Post–Trial Memorandum containing a comprehensive analysis of the facts and the law as well as references to exhibits and the transcript.

dants also observe that the continuation of the sale avoids additional fees and charges which mortgagees would incur if they were required to comply a second time with the statutory foreclosure requirements set forth in G.L. c. 244—fees that could exceed $1,500.00 and be recoverable from debtors.

With respect to the Debtor's Chapter 93A claim, the Defendants argue the following:

> [T]he Defendants did not take unfair advantage of the Plaintiff or commit any unfair or deceptive acts or practices with regard to the Plaintiff. The Plaintiff had received a substantial benefit from the Defendants as part of the 1993 Loan Modification. When the Defendants discovered the calculation error in [the] Loan Modification, they immediately identified that error to the Plaintiff and attempted to present the Plaintiff with options to assist them [sic] in correcting the error. In response to the letter to the Plaintiff advising him of these options, the Plaintiff chose a repayment schedule and sent the signed letter back to the Defendants. The Defendants at all times acted fairly and reasonably towards the Plaintiff, and did not utilize any unfair or deceptive acts or practices in attempting to correct the error in the 1993 Loan Modification.

Defendants' Requests for Rulings, pp. 16.

Finally, with respect to the Debtor's claim for emotional distress damages, the

Defendants maintain that the Debtor must establish the elements required for the common law torts of either intentional infliction of emotional distress, *see Godbout v. Cousens,* 396 Mass. 254, 264, 485 N.E.2d 940 (1985), *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976),[16] or negligent infliction of emotional distress, *see Payton v. Abbott Labs,* 386 Mass. 540, 556–57, 437 N.E.2d 171 (1982).[17]

## IV. DISCUSSION

The Court shall consider the counts of the Debtor's First Amended Complaint in the following order: Count II, Count III, Count I and VII, Counts IV and V, and Count VI. Based upon the evidence presented the Court finds that the Debtor has established, by a preponderance of the evidence, liability on the part of GMAC under the FDCPA and on the part of both Defendants under Chapter 93A and that his breach of contract claim is subsumed by the Chapter 93A count. The Court further finds that the Debtor has not established that Fannie Mae is vicariously liable for GMAC's violation of the FDCPA or that the Defendants violated TILA or the MCCCDA. Moreover, the Court finds that, under the circumstances of this case, Fannie Mae did not violate the automatic stay by postponing the foreclosure sale to a date certain after the Debtor filed his Chapter 13 petition.

**16.** In *Agis,* the court stated that to sustain an action for intentional infliction of emotional distress, a plaintiff must show, *inter alia,* "that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct." 371 Mass. at 144–45, 355 N.E.2d 315.

**17.** In *Payton,* the court indicated that in order for there to be a recovery for negligent infliction of emotional distress, the plaintiff "must allege and prove [that] she suffered physical harm as a result of the conduct which caused the emotional distress" [and] "that a plaintiff's physical harm must either cause or be caused by the emotional distress alleged, and that the physical harm must be manifested by objective symptomatology and substantiated

by expert medical testimony. Finally, the emotional distress for which compensation is sought must be reasonably foreseeable: unless a plaintiff proves that the defendant knew or should have known of special factors affecting that plaintiff's response to the circumstances of the case, the plaintiff can recover only for that degree of emotional distress which a reasonable person, normally constituted, would have experienced under those circumstances." 386 Mass. at 556–57. It summarized the elements as follows: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Id.* at 557.

A. *G.L. c. 183, § 60*

■ Section 60 of Chapter 183 provides in relevant part the following:

Whenever any note made to finance or refinance the purchase of and secured by a first lien on a dwelling house in the commonwealth of four or fewer separate households occupied or to be occupied in whole or in part by the mortgagor provides for installment payments of principal or interest or both that will not amortize the outstanding principal amount in full by the maturity of such note and the term of the mortgage securing the note is for a period longer than such note, such note and its disposition at maturity shall be subject to *automatic renewal or extension of the note at the option of the mortgagor* and such conditions and restrictions imposed by the commissioner. Such conditions and restrictions shall include, but not be limited to, the following: the minimum term of the note; the method by which the rate of interest on a renewed or extended note may be assigned; the maximum increase in the rate of interest at renewal or extension of note; provisions for decreases in the rate of interest at renewal or extension of the note as may be warranted by market conditions; *requirements for advance notification and explanation of adjustment of the rate of interest in connection with renewing or extending the note, provided that such notification and explanation shall occur no less than thirty days prior to the rate adjustment.*

G.L. c. 183, § 60 (emphasis supplied). Prior to its amendment in 1993, which amendment was approved on January 11, 1994, the statute did not expressly provide for automatic renewal or extension "at the option of the mortgagor."

■ In Massachusetts, statutes are prospective in their operation "unless an intention that they shall be retrospective appears by necessary implication from their words, context or objects when considered in the light of the subject matter, the preexisting state of the law and the effect upon existing rights, remedies and obligations." *Carpenter v. Granderson (In re Granderson)*, 214 B.R. 671, 675 (Bankr.D.Mass.1997)(citing *Child Support Enforcement Division of Alaska v. Brenckle*, 424 Mass. 214, 219, 675 N.E.2d 390 (1997)). Accordingly, the statute in effect at the time the Debtor executed the Loan Modification Agreement with GMAC in 1993 did not contain the express language making extension or renewal automatic at the option of the mortgagor.

This Court has found only one decision directly addressing § 60 and that decision dealt with an early formulation of the statute. Nevertheless, in *Micera v. Neworld Bank*, 412 Mass. 728, 592 N.E.2d 1294 (1992), the Supreme Judicial Court articulated the purpose of the statute. It stated the following:

[The] statute is directed at mortgage lenders who might take advantage of eager home buyers by initially allowing them favorable payment provisions in short-term balloon notes only thereafter to demand higher payments when the buyers cannot pay the notes in full and are obliged to seek their renewal. The statute reflects a legislative intent to protect home buyers from overreaching "by prohibiting certain acts or conduct which, even if not tortious, exacerbate or exploit consumer bargaining disadvantages. The harm sought to be prevented ... is, primarily, economic harm." ... From its inception in 1973, until now, G.L. c. 183, § 60, has been a statute designed to benefit consumers by shielding them from sharp practices in the grant of residential mortgage loans.

*Id.* at 731–32, 592 N.E.2d 1294 (citing *Mahoney v. Baldwin*, 27 Mass.App.Ct. 778, 781, 543 N.E.2d 435 (1989)).

The Court finds that G.L. c. 183, § 60 is not applicable to the facts of the instant case for several reasons. The note and mortgage executed by the Debtor on September 22, 1989 contained identical maturity dates of October 1, 2019. Further, the Loan Modification Agreement extended

the maturity date of the loan until November 1, 2020 beyond the date set forth in the mortgage, although the mortgage would undoubtedly continue to secure the unpaid debt. Thus, at least technically, the language of the statute is inapplicable to the instant case.

More importantly, the promissory note signed by the Debtor in September of 1989 was not a short term note which would require a large balloon payment when it matured. The balloon payment arising from the miscalculation of principal and interest following the 1993 loan modification also was not the result of a short term loan. Accordingly, the consumer protection issue that the Supreme Judicial Court determined the statute was designed to address is not present in the instant case. In the Court's view, GMAC's conduct with respect to the October 14, 1997 letter following the discovery of the miscalculation of principal and interest is better addressed under the FDCPA than under G.L. c. 183, § 60, and thus, the Court need not consider a potential right on the part of the Debtor to extend his note and mortgage because of the balloon payment as a factor in determining liability under the FDCPA.

### B. *Violation of the FDCPA*

#### 1. The FDCPA

Liability under the FDCPA, a statute designed to protect consumers from "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692(a), is predicated upon improper conduct on the part of "debt collectors" in collecting "debts" owed or allegedly owed by "consumers." It is to be liberally construed to effectuate its purpose. *See generally* Daniel A. Edelman, An Overview of the Fair Debt Collection Practices Act, 113 PLI/Corp. 87 (1999).

GMAC has admitted that it is a "debt collector" within the meaning of the FDCPA. Moreover, the evidence unequivocally established that the Debtor is a consumer, a "natural person obligated ... to pay any debt," 15 U.S.C. § 1692a(3),

that owed an obligation to Fannie Mae "to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

The FDCPA contains substantive prohibitions that apply to "communications" with consumers. A communication is defined to include "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The FDCPA requires that debt collectors "disclose clearly in all communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11).

The FDCPA specifically proscribes "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. It also proscribes the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. The statute provides the following with respect to false or misleading representations:

> Without limiting the general application of the foregoing, the following conduction is a violation of this section: ...
>
> (2) The false representation of -
>
> > (A) the character, amount, or legal status of any debt...
>
> > \*\*\*
>
> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken. . . .

15 U.S.C. § 1692e(2)(A) and (5). The FDCPA also makes it unlawful to "use unfair or unconscionable means to collect or attempt to collect any debt," including "[t]he collection of any amount (including

any interest, fee, charge, or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

■ In evaluating whether communications or conduct violates the FDCPA, courts utilize the so-called "least sophisticated debtor" standard. *Taylor v. Perrin, Landry, de Launay & Durand*, 103 F.3d 1232, 1236 (5th Cir.1997); *Clomon v. Jackson*, 988 F.2d 1314, 1318–19 (2d Cir.1993); *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1028–29 (6th Cir.1992); *Graziano v. Harrison*, 950 F.2d 107, 111 (3d Cir.1991); *Swanson v. Southern Oregon Credit Service, Inc.*, 869 F.2d 1222, 1225–26 (9th Cir.1988); *see also Gammon v. GC Services L.P.*, 27 F.3d 1254 (7th Cir.1994) ("unsophisticated consumer" standard). The Seventh Circuit has stated that "[a]nyway it's viewed, the standard is low," *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir.1996), and the phrase unsophisticated or least sophisticated debtor is used "to describe the hypothetical consumer whose reasonable perceptions will be used to determine if collection messages are deceptive or misleading." *Gammon*, 27 F.3d at 1257. The court observed that the standard protects consumers who are "of below average sophistication or intelligence" or are "uniformed, naive or trusting" while at the same time the reasonableness element "shields complying debt collectors from liability for unrealistic or peculiar interpretations of collection letters." *Id.*

■ Violation of any provision of the FDCPA entitles the consumer to an award of actual damages, statutory damages up to $1,000, costs and attorney's fees. 15 U.S.C. § 1692k(a). With respect to actual damages, which may include compensation for emotional distress, state law requirements that must be proven to establish negligent or intentional infliction of emotional distress are inapplicable. *See Teng v. Metropolitan Retail Recovery Inc.*, 851 F.Supp. 61, 68–69 (E.D.N.Y.1994); *Donahue v. NFS, Inc.*, 781 F.Supp. 188, 193–94 (W.D.N.Y.1991); *Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. 182, 185 (D.Del. 1991); *Crossley v. Lieberman*, 90 B.R. 682 (E.D.Pa.1988), *aff'd*, 868 F.2d 566 (3d Cir. 1989).

2.  The Violations

■ The Debtor argues that GMAC violated the FDCPA when its Loan Audit Department notified the Debtor that he was obligated "to repay the negative suspense amount of $1,622.40." The Court agrees. The Court finds the October 14, 1997 letter from the Loan Audit Department was a communication from a debt collector to a consumer with respect to a "debt" within the ambit of the FDCPA. In the October 14, 1997 letter, GMAC failed to indicate that it was attempting to collect a debt, couching its demand for payment by presenting three options to the Debtor for "repaying the negative suspense amount of $1,622.40." Moreover, the letter contained material misrepresentations as to the existence, character and legal status of the debt in violation of 15 U.S.C. § 1692e(2)(A).

In his testimony, Meinecke admitted that GMAC falsely represented to the Debtor that Fannie Mae had denied alternative requests to modify the current monthly principal and interest payment to a fully amortizing payment or to extend the maturity date to eliminate the potential liability for a balloon payment, and he admitted that GMAC unilaterally elected to prepay principal in the amount of $1,622.40 to permit the Debtor's loan to fully amortize over the balance of its term, thereby avoiding a potential balloon payment of $10,262.18. Meinecke indicated that GMAC did not want to burden the Debtor with the preparation of financial statements that would support modifying the terms of the loan. Whether the intentions of GMAC personnel were good or bad is immaterial because their conduct induced the Debtor to agree to pay GMAC $1,622.40, even though the Collection Department had recent financial information which supported GMAC's decision to enter

into a forbearance agreement with the Debtor and which may have supported a decision by Fannie Mae to modify the terms of his loan.

More importantly, GMAC's demand for repayment of the negative suspense amount implied the existence of a real debt. The Court finds, however, that the Debtor already was obligated to repay principal in the amount set forth in the Loan Modification Agreement of October 14, 1993 and that the $1,622.40 that GMAC advanced to Fannie Mae was part of that amount. GMAC's decision to pay down the principal and then demand payment from the Debtor created an artificial obligation on the part of the Debtor that was based upon the assumption that the Debtor would never be in a position to prepay the debt prior to the maturity of the note. Thus, in sending the October 14, 1997 letter, GMAC violated § 1692e(2)(A).

The Court further finds that the references to the potential $10,262.18 balloon payment[18] and the "negative suspense account," could only serve to confound the Debtor, who must be viewed as a hypothetical unsophisticated consumer, especially because the letter lacked the disclosures required by 15 U.S.C. § 1692a(11). Thus, the implication that the Debtor could be liable for a $10,262.18 balloon payment was coercive and violative of both §§ 1692e(5) and 1692f(1), particularly as such a balloon payment was not expressly authorized by either the Loan Modification Agreement or the original loan documents.

The Court agrees with the Debtor that his election to repay the negative suspense amount of $1,622.40 did not create a binding agreement in view of the material misrepresentations made in the letter. Accordingly, the Debtor may avoid the repayment agreement.

3. Vicarious Liability

■ The Court finds that the Debtor has failed to establish legal grounds for liability on the part of Fannie Mae for GMAC's violation of the FDCPA. While the Debtor has made a number of equitable arguments for imposing such liability, he failed to cite a single case in which such liability was imposed on an entity that did not fit within the statutory definition of a debt collector.[19] *See Caron v. Charles E. Maxwell, P.C.,* 48 F.Supp.2d 932 (D.Ariz. 1999). Accordingly, the Court rejects the Debtor's argument to impose vicarious liability on Fannie Mae.

4. Damages

■ The Debtor is entitled to actual damages for violation of § 1692, as well as statutory damages and attorney fees. In *Smith v. Law Offices of Mitchell N. Kay,* 124 B.R. at 188, the court, referring to decisions under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., a consumer protection statute schematically similar to the FDCPA, as well as congressional intent to supplement inadequate state law remedies and to create a uniform law governing debt collection, held that "when a

18. *See* note 10, *supra.*

19. In *Caron,* the court stated the following:
Although the FDCPA is silent on the issue of vicarious liability, courts have held that the client of an attorney working as a "debt collector" as defined in § 1692a(6) of the FDCPA is only liable for his attorney's violations if both the attorney and the client are debt collectors within the meaning of the statute. *First Interstate Bank v. Soucie,* 924 P.2d 1200, 1202 (Colo.App.1996); *Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1516 (9th Cir.1994) (holding a client vicariously liable for the debt collector attorney's misconduct where the client itself was a

debt collector within the meaning of the statute). As the Sixth Circuit has held:
> We do not think it would accord with the intent of Congress, as manifested in the terms of the Act, for a company that is not a debt collector to be held vicariously liable for a collection suit filing that violates the Act only because the filing attorney is a 'debt collector.'

*Wadlington v. Credit Acceptance Corp.,* 76 F.3d 103, 108 (6th Cir.1996) (holding that FDCPA imposes liability only on a debt collector, not on non-debt collectors, such as a consumer's creditors or an assignee of a debt). 48 F.Supp.2d at 936.

violation of the FDCPA has been established, actual damages for emotional distress can be proved independently of state law requirements." *See also Donahue v. NFS, Inc.*, 781 F.Supp. 188, 193 (W.D.N.Y. 1991).

The Debtor failed to prove either intentional or negligent infliction of emotional distress under the standards established by courts in Massachusetts.[20] He made "generalized assertions" about his anger toward GMAC arising from the misapplication of his February 1998 payment under the forbearance agreement. *Cf. Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.1999) (debtor "provided specific information about the sharp decline in social invitations and outings following Fleet's violation of the automatic stay rather than 'generalized assertions' of his emotional state"). He did not testify, however, that the Defendants' conduct caused him to experience physical symptoms or that he needed medical attention. He testified that he had a neurological disorder, but there was no evidence that the disorder was caused by the Defendants' conduct.

The Court accepts the Debtor's testimony that he was angered, frustrated, and emotionally distressed by his dealings with GMAC. Indeed, GMAC's records corroborate the Debtor's testimony that he was exasperated, felt harassed, and believed that GMAC was wasting his time. His testimony was unrebutted. Although the Debtor did not precisely quantify his damages, he demonstrated that he suffered as a result of GMAC's actions.

In *Smith v. Law Offices of Mitchell N. Kay*, the court determined that the following jury instruction correctly stated the law under the FDCPA:

> [A]ctual damages may be awarded the plaintiff as a result of the failure of defendants to comply with the Act. Actual damages not only include any out of pocket expenses, but also damages for personal humiliation, embarrassment, mental anguish or emotional distress. You must determine a fair and adequate award of these items through the exercise of your judgment and experience in the affairs of the world after considering all the facts and circumstances presented during the trial of this case.

124 B.R. at 185. The Court has considered this statement of the law, as well as decisions in which courts have considered damage awards for mental anguish where the testimony has been limited to fairly generalized statements about anger and frustration. In these cases, plaintiffs have been awarded damages in sums ranging from $100.00, *see Donahue v. NFS, Inc.*, 781 F.Supp. 188 (W.D.N.Y.1991), to $5,000.00, *see Howze v. Romano*, No. 92–644–SLR, 1994 WL 827162 (D.Del. December 9, 1994), *see also Smith v. Law Offices of Mitchell N. Kay*, 124 B.R. at 193 ($3,000.00). In view of this precedent and the Debtor's testimony, the Court awards the Debtor $3,000.00 in actual damages attributable to emotional distress. This sum represents $500.00 per month for each month after GMAC misdirected the Debtor's payment until September of 1998 when the Debtor obtained the protection of the automatic stay.

With respect to the Debtor's entitlement to statutory damages, a plaintiff is entitled to a single award of $1,000.00. *Wright v.*

---

**20.** *See Haddad v. Gonzalez*, 410 Mass. 855, 871, 576 N.E.2d 658 (1991), in which the court outlined the following elements of a cause of action for intentional infliction of emotional distress:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; ... (2) that the conduct was 'extreme and outrageous' ...;

> (3) that the actions of the defendant were the cause of the plaintiff's distress; ... and (4) that the emotional distress sustained by the plaintiff was 'severe'....

410 Mass. at 871 (citing *Simon v. Solomon*, 385 Mass. 91, 95, 431 N.E.2d 556 (1982), and *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144–45, 355 N.E.2d 315 (1976)). *See also Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982) and note 17, *supra*.

*Finance Service of Norwalk, Inc.,* 22 F.3d 647 (6th Cir.1994); *Harper v. Better Business Services, Inc.,* 961 F.2d 1561 (11th Cir.1992); *Howze v. Romano,* No. 92–644–SLR, 1994 WL 827162 (D.Del. December 9, 1994) (citing *Beattie v. D.M. Collections, Inc.,* 764 F.Supp. 925 (D.Del.1991)). Accordingly, the Debtor is entitled to an additional $1,000 in damages, as well as attorney's fees incurred in conjunction with bringing the instant adversary proceeding, which fees shall be the subject of a further order upon the submission of a fee application. In summary, the Court awards the Debtor $4,000.00 in damages, plus attorney's fees, which are subject to final approval.

### C. *Violations of the Massachusetts Consumer Protection Act*

#### 1. The Statute

The Massachusetts Consumer Protection Act provides that "[u]nfair methods of competition and unfair or deceptive acts or practice in the conduct of any trade or business are ... unlawful." G.L. c. 93A, § 2(a).[21] Section 9 of Chapter 93A provides the following:

(1) Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder ... may bring an action...

(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. Any person receiving such a demand for relief who, within thirty days of the mailing or delivery of the demand for relief, makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner. In all other cases, if the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount *if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two.* For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim...

(4) If the court finds in any action commenced hereunder that there has been a violation of section two, the petitioner shall, in addition to other relief provided by this section and irrespective of the amount in controversy, be awarded rea-

---

**21.** The Attorney General has issued regulations with respect to what constitutes unfair and deceptive practices that provide in pertinent part the following:

Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of G.L. c. 93A, § 2 if:
(1) It is oppressive or otherwise unconscionable in any respect; or ...
(3) It fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection; or
(4) It violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2.
940 Code Mass. Reg. § 3.16.

sonable attorney's fees and costs incurred in connection with said action; provided, however, the court shall deny recovery of attorney's fees and costs, which are incurred after the rejection of a reasonable written offer of settlement made within thirty days of the mailing or delivery of the written demand for relief required by this section.

G.L. c. 93A, § 9(1), (3)-(4) (emphasis supplied).[22]

As the Court observed in a case cited by the Defendants, *Heller v. Silverbranch Constr. Corp.*, 376 Mass. 621, 624, 382 N.E.2d 1065 (1978), "Chapter 93A ... is a statute of broad impact whose basic policy is to ensure an equitable relationship between consumers and persons engaged in business." According to the court in *Heller*, courts in the Commonwealth "have consistently held that consumer protection statutes created new substantive rights by making conduct unlawful which was not previously unlawful under the common law or any prior statute." *Id.* at 626, 382 N.E.2d 1065. Moreover, in *Mechanics Nat'l Bank of Worcester v. Killeen*, 377 Mass. 100, 384 N.E.2d 1231 (1979), another decision cited by the Defendants, the court observed the following:

> Just as every lawful act is not thereby automatically free from scrutiny as to its unfairness under c. 93A, so not every

unlawful act is automatically an unfair (or deceptive) one under G.L. c. 93A. "The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful (or unlawful, we now add) apart from G.L. c. 93A but also by analyzing the effect of the conduct on the public (or the consumer)."

377 Mass. at 109, 384 N.E.2d 1231 (citations omitted).

### 2. The Violation

■ The Court finds that the Defendants breached the implied covenant of good faith and fair dealing that was part of the contract with the Debtor and, in so doing, also violated Chapter 93A.[23] Specifically, the Court finds that GMAC's Collection Department advised the Debtor on December 17, 1997 to make his mortgage payments pursuant to the forbearance agreement when he called them following receipt of postage prepaid envelopes from the Loan Audit Department coupled with instructions to send an extra $180.27 per month to GMAC with his regular mortgage payment. Although the Collection Department was alerted to confusion on the part of the Debtor in December of 1997 and had no explanation for why he was in receipt of the envelopes, it took no

**22.** In *Haddad v. Gonzalez*, 410 Mass. at 864–65, 576 N.E.2d 658, the court noted that by St.1979, c. 406, § 1, the Legislature, apparently in reaction to the restrictive holding in *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 337 N.E.2d 701 (1975), deleted the "loss of money or property" requirement in § 9 and replaced it with a much broader "[a]ny person ... who has been injured" provision.

**23.** The Court observes that the Debtor did not send his Chapter 93A demand letter to the Defendants 30 days prior to filing his complaint. Rather, he sent the demand letter to the Defendants on the same day that he filed his complaint. However, the Debtor's original complaint did not contain a count under Chapter 93A. The Debtor included a Chapter 93A count in his First Amended Complaint which he filed on November 20, 1998. In *York v. Sullivan*, 369 Mass. 157, 338 N.E.2d

341 (1975), the Supreme Judicial Court observed the following:

> [T]he thirty-day requirement, as part of the requirement of a written demand for relief, is a prerequisite to suit, to be alleged and proved. But it is not jurisdictional in the sense that a party cannot waive it, and we do not think it is open to the judge to raise the point on his own motion after trial and long after the thirty days have expired. Demand before suit is often a fruitless ceremony....

> \* \* \*

> [E]ven if the first suit could be treated as a suit under c. 93A, subject to dismissal because it was begun too soon, such a dismissal should not ordinarily bar a suit brought after thirty days had run....

369 Mass. at 163–64. *See also Tarpey v. Crescent Ridge Dairy, Inc.*, 47 Mass.App.Ct. 380, 391, 713 N.E.2d 975 (1999).

steps to ascertain whether his confusion was justified. Rather, having been apprised of a potential problem, Collection Department personnel, in effect, abandoned the Debtor, the consumer, to the ambiguities and vagaries of its computer system and muddled internal operations, contrary to its representation on February 24, 1998 that it would contact him once his account was straightened out internally.

The Court need not determine whether this conduct in and of itself violated Chapter 93A. The Court finds that when that conduct is coupled with GMAC's misapplication of the Debtor's February mortgage payment and decision to proceed with foreclosure **after** becoming aware of the fact that the Debtor had complied with his payment obligations under the forbearance agreement GMAC and Fannie Mae violated Chapter 93A. Not only did GMAC's actions constitute an unfair trade practice, they violated Fannie Mae's own servicing guidelines, which encouraged the avoidance of foreclosure and the implementation of management review procedures for evaluating decisions to foreclose.[24] The evidence established that the Debtor had ample reason to be confused about the status of his account with GMAC. At one time or another, he received communications from four different departments at GMAC. When he called GMAC, he mistakenly, but not surprisingly, contacted the Collection Department about the repayment agreement that was transmitted to him by the Loan Audit Department. This error was excusable because he was in receipt of correspondence from different departments and was unaware of the inability of GMAC employees to access computer records from departments other than their own. What was not excusable was GMAC's advice, in effect, to ignore the envelopes and the $180.27 per month additional payment obligation[25] **and** its inability or unwillingness to straighten out the Debtor's account in a timely manner.[26] Kris Caya and Meinecke determined to transfer the Debtor's loan to foreclosure in May of 1998. In her memorandum of November 10, 1998, Ms. Caya misrepresented the timing of the discovery of the misapplication of the February 1998 payment. Nevertheless, she correctly and candidly observed, "[p]erhaps the customer was confused with both repayment plans being established by 2 different [departments]." Given that GMAC's Collection Department was confused, it is not surprising that the Debtor was confused. Indeed, it is hard to imagine that any consumer would not be confused by the plethora of messages from GMAC.

In view of Ms. Sands testimony about how GMAC's computer system functioned, resolution of the problem stemming from the misapplication of the February payment was not within the Debtor's control. GMAC did not understand what transpired with the Debtor's February 1998 payment until Scott Lathrop researched the Debtor's account. Having ascertained that the Debtor made payments under the forbearance agreement, GMAC nevertheless transferred the loan to foreclosure ostensibly because of the Debtor's late payments under the forbearance agreement. However, GMAC and Fannie Mae's internal policies encouraged avoidance of foreclosure, and the Debtor consistently had

---

**24.** See n. 11, *supra*.

**25.** *See Glickman v. Brown*, 21 Mass.App.Ct. 229, 235, 486 N.E.2d 737 (1985) ("We hold ... that a negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, § 2(a)'').

**26.** The Collection History Report for February 24, 1998 contains a notation that Collection Department personnel would have Scott Lathrop look into the problem. On May 19, 1998, the Collection History Report contains a notation that a copy of the account would be sent to Scott Lathrop to research. Apparently, it took 11 weeks to get Scott Lathrop to investigate the account and then it did not seem to matter what his research produced because Meinecke decided just two days later, on May 21, 1998, not to use the $924.29 that was in a suspense account for a monthly mortgage payment.

made his mortgage payments, both prior to and during the term of the forbearance agreement, around the middle of the month.

■ The Court finds that GMAC's course of conduct constituted a violation of Chapter 93A, and that Fannie Mae as the owner of the Debtor's Note and Mortgage is vicariously liable for GMAC's actions. *See Blanchette v. Cataldo,* 734 F.2d 869 (1st Cir.1984). Moreover, GMAC and Fannie Mae continued with the foreclosure sale despite Attorney Quinn's efforts in forwarding copies of the Debtor's checks to Harmon Law Offices. Because the October 14, 1997 letter from the Loan Audit Department, which letter the Court has found violated the FDCPA, triggered a chain of events that victimized the Debtor, the Court finds that the conduct of both GMAC and Fannie Mae constituted an unfair trade practice that violated Chapter 93A.

### 3. Damages

■ The Court finds that the Debtor is entitled to recover under Chapter 93A for his actual damages, costs and attorney's fees. The Debtor testified that he suffered emotional distress. Attorney Quinn testified that the Debtor exhibited signs of stress and drove in an unsafe manner. The Debtor, however, did not quantify his emotional distress claim. More importantly, he did not prove either intentional or negligent infliction of emotional distress, and, in the absence of reckless conduct or physical symptoms sufficient to support liability for these common law torts under Massachusetts law, there can be no recov-

ery for emotional distress under Chapter 93A. The Court has found no case in which a plaintiff has recovered emotional distress damages under Chapter 93A in the absence of proof of intentional infliction of emotional distress. *See Haddad v. Gonzalez,* 410 Mass. at 870–72, 576 N.E.2d 658.

■ With respect to other damages, the Court finds that the Debtor is entitled to damages associated with the filing of his Chapter 13 petition, including 1) the payment of the filing fee; 2) his attorney's fees which were incurred, not in bringing the Chapter 93A action, but in representing the Debtor in his Chapter 13 case (i.e., in preparing the petition, schedules, statement of financial affairs, and Chapter 13 plan); and 3) the Chapter 13 Trustee's commission.

With respect to attorney's fees and the potential for multiple damages, the Court must consider the Debtor's Chapter 93A demand letter and the Defendants' response. The Court finds that the Defendants' response to the Debtor's Chapter 93A letter was not unreasonable. The Court further finds that GMAC and Fannie Mae's conduct was not a willful and knowing violation of § 2, but rather the result of poor management practices relating to its computer system and personnel training. Accordingly, under G.L. c. 93A, § 9(4), Debtor's counsel is only entitled to attorney's fees up until the date that the Debtor rejected the offer of settlement.[27] Counsel to the Debtor shall be required to file an appropriate fee application with this Court.

---

**27.** In this regard, the Court notes that it is its intention to compensate the Debtor for his attorney's fees both for representing the Debtor during the Chapter 13 case as an element of damage under Chapter 93A and for representing the Debtor in this adversary proceeding. Although the Court finds that the Debtor's attorney is not entitled to attorney's fees under Chapter 93A in this adversary proceeding after receipt of the Defendants' response on or around November 10, 1998, the Court has determined that the Debtor is entitled to attorney's fees with respect to this adversary

proceeding under the FDCPA. Because all the alleged causes of action arose out of the same transactions and occurrences, the Court does not intend to require Debtor's counsel to attempt to allocate his time to specific counts of the Debtor's complaint. Thus, the result of the Court's order will be that Debtor's counsel's fees will be paid in full regardless of whether they arose pre- or postpetition or whether they were incurred in conjunction with the Chapter 13 case or this adversary proceeding.

This Court often sits as a court of equity, *see* 11 U.S.C. § 105(a), and "[a] court sitting in equity ... is necessarily empowered to do complete justice as between the parties." *United Companies Lending Corp. v. Sargeant*, 20 F.Supp.2d 192, 210 (D.Mass.1998). The Court thus orders the following additional equitable relief:

1. GMAC and Fannie Mae shall remove the Debtor's loan from foreclosure default status and shall forthwith notify any credit reporting agencies that the Debtor's mortgage is no longer in foreclosure;

2. GMAC and Fannie Mae shall not be entitled to charge the Debtor with any bankruptcy or foreclosure fees and costs, including attorney's fees, incurred in conjunction with the Debtor's Chapter 13 case and this adversary proceeding;

3. GMAC and Fannie Mae shall not be entitled to any amounts due for the error in amortizing the Debtor's loan, and the Debtor shall not be liable for the $1,644.20 advanced by GMAC to Fannie Mae, with the effect being that the Debtor's loan will mature on November 20, 2020 with the Debtor's principal and interest payments remaining at $768.69;

4. GMAC and Fannie Mae shall be entitled to late charges of $607.11 and shall not be entitled to any additional late charges after January 31, 1998; and

5. The Debtor shall cure any prepetition arrearages, stemming from the misapplication of the February 1998 payment and the return of and refusal to accept payments made by the Debtor during and after May of 1998 calculated on the basis of monthly principal and interest payments of $768.69, plus appropriate amounts for real estate tax and insurance escrow, and the Debtor shall filed an amended Chapter 13 plan.

In view of this equitable relief, GMAC must file an accounting and the Debtor must file an amended Chapter 13 plan so that the Debtor's obligations under the Loan Modification Agreement are clear and the Chapter 13 Trustee can establish that the Debtor is comporting with the terms of the Loan Modification Agreement.

### D. *Violation of TILA and the CCCDA*

#### 1. TILA

Section 1603 of TILA delineates transactions that are exempt from its provisions. These exempt transactions include, *inter alia*, business, commercial and agricultural loans and student loans, as well as "[t]ransactions for which the Board, by rule, determines that coverage under this subchapter is not necessary to carry out the purposes of this subchapter." 15 U.S.C. § 1603(5). The term "transaction" is not defined in TILA or Regulation Z; however, "the term "residential mortgage transaction" is defined as a transaction in which a mortgage, deed of trust, purchase money security interest arising under an installment sales contract, or equivalent consensual security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling." 15 U.S.C. § 1602(w).

Regulation Z, 12 C.F.R. §§ 226.1—226.33 and Appendices A—L, provides that

A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer... The following shall not be treated as a refinancing: ...

(2) A reduction in the annual percentage rate with a corresponding change in the payment schedule....

(4) A change in the payment schedule or a change in collateral requirements as a result of the consumer's default or delinquency, unless the rate is increased, or the new amount financed exceeds the unpaid balance plus

earned finance charge and premiums for continuation of insurance of the types described in § 226.4(d).

12 C.F.R. § 226.20(a).

2. Analysis

■ The Court rejects the Debtor's arguments that TILA applies to the 1993 Loan Modification Agreement, the 1997 forbearance agreement, or the October 14, 1997 letter demanding repayment of $1,622.40. Pursuant to the 1993 Loan Modification Agreement, the Debtor, after failing to make mortgage payments for 13 months, obtained a 3% reduction in the interest rate applicable to the note secured by a mortgage on the Mattapan Property. The Loan Modification Agreement also resulted in an extension in the term of the loan, as well as an overall reduction in the Debtor's obligation in a sum in excess of $70,000, assuming the Debtor would not avail himself of the prepayment option. Accordingly, the 1993 Loan Modification is excepted from TILA by the express provisions of Regulation Z. The miscalculation of the monthly principal and interest payment does not change the result. As discussed above, the Defendants' conduct resulting from that miscalculation is more than adequately addressed by other consumer protection statutes. Similarly, the 1997 forbearance agreement and the repayment agreement with respect to the principal reduction do not constitute refinancings that would require new disclosures. This is because the existing obligation was not satisfied or replaced by either agreement. In the absence of legal authority from this or any circuit, the Court rejects the Debtor's invitation to add a judicial gloss to TILA and Regulation Z.

2. MCCCDA

■ The MCCCDA was closely modeled on TILA, *Mayo v. Key Fin. Services, Inc.,* 424 Mass. 862, 864, 678 N.E.2d 1311 (1997), and its provisions should be construed in accordance with TILA. *In re Desrosiers,* 212 B.R. 716, 722 (Bankr.

D.Mass.1997). As the court in *Desrosiers* observed:

Both TILA and CCCDA were enacted "to assure a meaningful disclosure of credit terms so that ... consumers[s] w[ould] be able to compare more readily the various credit terms available to [them] and avoid the uninformed use of credit, and to protect ... consumers[s] against inaccurate and unfair credit billing and credit card practices...."

212 B.R. at 722 (citing *In re Botelho,* 195 B.R. 558, 564 (Bankr.D.Mass.1996)). The court in *Desrosiers* also observed that the Board of Governors of the Federal Reserve System exempted credit transactions subject to MCCCDA "from chapters 2 and 4 of the federal act," pursuant to authority granted it in 15 U.S.C. § 1633. 212 B.R. at 722 n. 6. Thus, except for those chapters, "[c]ompliance with any provisions of [TILA], the Board's Regulation Z, and the Official Staff Commentary, which does not conflict with [CCCDA], [the regulations thereunder] or an advisory ruling of the Commissioner, shall be deemed to be in compliance with [CCCDA]." 212 B.R. at 722 (citing 209 Code Mass. Regs., § 32.27 (1977)). Based upon the above analysis of MCCCDA, the Court finds that the 1993 Loan Modification Agreement, the 1997 forbearance agreement and the October 14, 1997 letter are exempt from the provisions of the MCCCDA, as well as TILA.

E. *Violation of the Automatic Stay*

■ Section 362(a) provides in relevant part the following:

(A) Except as provided in subsection (b) of this section, a petition filed under sections 301, 302, or 303 of this title, ... operates as a stay, applicable to all entities, of -

(1) the commencement or *continuation,* including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this ti-

tle, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1) (emphasis supplied). The issue that the Court must determine is whether the continuation by Fannie Mae of the foreclosure sale scheduled for September 2, 1998, one day after the Debtor filed his Chapter 13 petition, to December 2, 1998 violated the automatic stay.

In *Roche v. Franklin First Fed. Savings Bank (In re Roche)*, 228 B.R. 102, 103 (Bankr.M.D.Pa.1998), the court observed that "the sheer volume of authority" supports the view that postponement of a foreclosure sale in accordance with state law does not violate the automatic stay. It stated that "every court that has studied this specific issue (and not been reversed) has found no violation." *Id.*[28] Following the decision in *Roche*, the Unites States Court of Appeals for the Third Circuit in *Taylor v. Slick*, 178 F.3d 698 (3d Cir.1999), indicated that it was persuaded by the "consistent line of cases from other courts," namely those cited by the bankruptcy court in *Roche*. It stated its rationale as follows:

> According to the principle of *noscitur a sociis*, the word "continuation," as used in § 362(a)(1), must be read in conjunction with other words that surround it, such as "commencement." Upon such examination, it becomes apparent that the filing of a bankruptcy petition prohibits the beginning ("commencement") of a judicial proceeding and the carrying forward ("continuation") of a proceeding that has already begun.
>
> The "continuation" of a sheriff's sale, on the other hand, connotes the postponement of a proceeding, and effectuates the purposes of § 362(a)(1) by preserving the status quo until the bankruptcy

process is completed or until the creditor obtains relief from the automatic stay. *See Workingmen's Savings*, 652 A.2d at 328 ("Postponement notices which specify a new sale date merely preserve the status quo between creditor and debtor."); *see also Zeoli*, 148 B.R. at 701 ("The postponement of a foreclosure sale is certainly an 'act.' But it is not an act in 'continuation' of a proceeding 'against the debtor' prohibited by § 362(a)(1). Rather, it is more appropriately characterized as an act in preservation of a stayed proceeding."). A postponement notice does not, by itself, permit the rescheduled sheriff's sale to occur. So long as the bankruptcy petition is pending before the bankruptcy court, a creditor must apply for and obtain relief from the stay before it can proceed with the sale on the date certain. Rule 3129.3(b), Pennsylvania Rules of Civil Procedure, preserves the status quo and permits the creditor to avoid duplicative foreclosure costs that would eventually be deducted from the proceeds of the sale (to the disadvantage of the debtor). *See Zeoli*, 148 B.R. at 701. It is therefore clear that Rule 3129.3(b) comports with § 362(a)(1).

178 F.3d at 702.

Although there is no decision from the First Circuit directly holding that the continuation of a foreclosure sale does not violate the automatic stay, the United States Court of Appeals for the First Circuit considered a case in which a lienholder continued a sheriff's sale of property during the pendency of the Debtor's Chapter 13 case and proceeded to conduct the sheriff's sale after a Chapter 13 petition had been dismissed. *Lugo v. de Jesus Saez (In re de Jesus Saez)*, 721 F.2d 848 (1st Cir.1983). The sale took place on the con-

---

28. The court cited the following cases: *In re Peters*, 101 F.3d 618 (9th Cir.1996); *In re Roach*, 660 F.2d 1316, 1319 (9th Cir.1981); *In re Fritz*, 225 B.R. 218 (E.D.Wash.1997); *Zeoli v. RIHT Mortgage Corp.*, 148 B.R. 698 (D.N.H.1993); *In re Tome*, 113 B.R. 626, 630–32 (Bankr.C.D.Cal.1990); *In re Barnes*, 119 B.R. 552, 556 (S.D.Ohio 1989); *In re Taylor*, 207 B.R. 995, 999 (Bankr.W.D.Pa.1997); *In re Stober*, 193 B.R. 5 (Bankr.D.Ariz.1996); *In re Doud*, 30 B.R. 731, 733–34 (Bankr. W.D.Wash.1983); *Workingmen's Savings and Loan Association of Dellwood Corp. v. Kestner*, 438 Pa.Super. 186, 652 A.2d 327 (1994).

tinued sale date, which was after the dismissal of the case. The First Circuit recognized that the bankruptcy court based its finding that there was a violation of the automatic stay in part on the secured party's "prior preparations and attempt at sale" during the pendency of the case, but determined that it could not uphold the bankruptcy court's damage award on that basis. 721 F.2d at 853. It stated:

First, it is obvious that at least the present award cannot stand, since the bankruptcy court cannot be presumed to have intended the same redress for earlier unconsummated acts as for the actual sale of the house.

Second, we do not believe that the earlier acts, standing alone, support an award of compensatory damages to de Jesus.

With respect to the abortive April 1 auction, the record shows no evidence of actual damage to de Jesus from that event. Civil contempt proceedings are limited to redressing actual injury of those harmed by the contemnor's conduct.

\*\*\*

It is a closer question whether [the secured party] could be deemed to have contemptuously violated section 362 by proceeding, after learning of the chapter 13 petition, to schedule the sheriff's sale for May 2 and finally for May 14. [The secured party] did, however, petition the bankruptcy court to lift the stay and we have no reason to imagine he would have proceeded with the auction had the chapter 13 petition not been dismissed. Similar actions were held not to have violated the automatic stay in *In re Roach,* 660 F.2d 1316 (9th Cir.1981). Like the creditor in *Roach,* [the secured party] did little more than reschedule the auction and advertise the new date from the time he learned of the petition

until its dismissal. It was not shown that these preparatory acts either harassed de Jesus or revived "the financial pressures that drove [her] into bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 54, reprinted in 1978 U.S.Code Cong. & Ad. News 5787, 5840–41. *Cf. In re Demp,* 23 B.R. 239 (Bkrtcy. E.D.Pa.1982) (awarding attorneys' fees, but not damages, against creditor who posted notice of sheriff's sale on debtor's house).

721 F.2d at 853. In view of the court's citation to the Ninth Circuit's decision in *In re Roach* and the significant number of decisions following it, including a decision from the District of New Hampshire, *Zeoli v. RIHT Mortgage Corp.,* 148 B.R. 698 (D.N.H.1993), this Court concludes that the First Circuit in all likelihood would follow the Ninth and Third Circuits in holding that the mere postponement of a foreclosure sale for three months preserves the status quo and does not violate the automatic stay.[29] Accordingly, the Court rejects the Debtor's argument that Fannie Mae's failure to file a motion for relief from the automatic stay distinguishes this case from the cases cited and that its conduct "amounted to a gratuitous threat of action which it could not, under the circumstances, lawfully take." Moreover, the Court finds that the Debtor's testimony was insufficient to permit a finding that the mere postponement of sale revived the financial pressures on him or harassed him. Thus, the Court finds that the Debtor is not entitled to judgment on Count VI of his Second Amended Complaint.

#### F. *The Objection to Confirmation*

In view of the above findings and rulings, the Court overrules the Defendants' objection to confirmation.

---

**29.** The Court's holding is limited to the facts of this case, as the Court can conceive of circumstances in which postponement of a foreclosure sale may violate the automatic stay. For example, if a secured party repeatedly continued the foreclosure sale for brief periods, it is conceivable that harassment rather than the preservation of the status quo would be motivating the creditor and warrant judicial intervention.

## V. CONCLUSION

In view of the foregoing, the Court shall deny the Defendants' Motion for a Directed Verdict and shall issue a judgment in favor of the Defendants and against the Debtor on Counts II, IV, V, VI. The Court shall enter judgment in favor of the Debtor and against GMAC on Count III in the amount of $4,000.00 plus attorney fees to be awarded to Debtor's counsel and in favor of the Debtor and against both Defendants on Counts I and VII. The Court shall enter an order requiring the Defendants to produce an accounting to the Debtor within 20 days of the date of this Memorandum and counsel to the Debtor to file an itemization of all costs incurred in filing the Chapter 13 plan, including the filing fee and the Trustee's commission, and a fee application with respect to his services in conformity with MLBR 2016-1 within 30 days of the date of the Memorandum.

### ORDER

In accordance with the Memorandum dated March 27, 2000, the Court denies the Defendants' Motion for a Directed Verdict and overrules the Defendants' Objection to confirmation of the Debtor's First Amended Chapter 13 Plan.

The Court enters judgment in favor of the Defendants and against the Debtor on Counts II, IV, V, VI of the Debtor's Second Amended Complaint. The Court enters judgment in favor of the Debtor and against GMAC on Count III in the amount of $4,000.00 plus attorney fees to be awarded to Debtor's counsel. The Court enters judgment in favor of the Debtor and against both Defendants on Counts I and VII. Additionally, the Court orders the following with respect to Count VII:

1. GMAC and Fannie Mae shall remove the Debtor's loan from foreclosure default status and shall forthwith notify any credit reporting agencies that the Debtor's mortgage is no longer in foreclosure;

2. GMAC and Fannie Mae shall not be entitled to charge the Debtor with any bankruptcy or foreclosure fees and costs, including attorney's fees, incurred in conjunction with the Debtor's Chapter 13 case and this adversary proceeding;

3. GMAC and Fannie Mae shall not be entitled to any amounts due for the error in amortizing the Debtor's loan, and the Debtor shall not be liable for the $1,644.20 advanced by GMAC to Fannie Mae, with the effect being that the Debtor's loan will mature on November 20, 2020 with the Debtor's principal and interest payments remaining at $768.69;

4. GMAC and Fannie Mae shall be entitled to late charges of $607.11 and shall not be entitled to any additional late charges after January 31, 1998; and

5. The Debtor shall cure any prepetition arrearages, stemming from the misapplication of the February 1998 payment and the return of and refusal to accept payments made by the Debtor during and after May of 1998 calculated on the basis of monthly principal and interest payments of $768.69, plus appropriate amounts for real estate tax and insurance escrow, and the Debtor shall filed an amended Chapter 13 plan.

The Court further orders the Defendants to produce an accounting to the Debtor within 20 days of the date of this Order and counsel to the Debtor to file an itemization of all costs incurred in filing the Chapter 13 plan, including the filing fee and the Trustee's commission, and a fee application with respect to his services in conformity with MLBR 2016-1 within 30 days of the date of the Memorandum.